## STANTON V. STATE.

1. In an action against the state to recover for subsistence furnished for men and horses, alleged to have been called into service by the governor to assist in suppressing insurrection and repelling invasion, a complaint is defective which alleges that the governor caused "to be enlisted, enrolled, and mustered into the military service of the state a large number of soldiers, cavalary, rangers, and scouts," to which such substance was furnished, without showing that there was no adequate and available militia already enrolled and organized as provided by law.

2. If the governor had power to cause to be enlisted and mustered, into the service of the state, "soldiers, cavalary, rangers, and scouts," other than those constituting the enrolled militia ot the state, such power would be an implied power springing from his paramount duty to suppress insurrection and repel invasion, and would only exist when and because the exercise of his power to call out the enrolled and organized militia would be unavailing.

3. The facts from which only such implied power could spring, conceding that he might have and exercise it, should be stated, in order to show its existence and his right to exercise it.

4. Section 9, art. 11, of the constitution declares that "no indebtedness shall be incurred * * * by the state, * * * except in pursuance of an appropriation for the specific purpose first made," and section 3, art. 12, provides, that, "the legislature shall never * * * authorize the payment of any claims, or part thereof, created against the state under any agreement or contract made without express authority of law, and all such unauthorized agreements or contracts shall be null. and void." Under these constitutional prohibitions, neither the governor nor his appointee could, "without express authority of law." make a contract for the subsistence of these military forces which would be legally binding upon the state, and upon which an action could be maintained in the courts.

5. A claim to recover for such subsistence cannot rest upon contractual rights, for the creation of such rights in such manner is expressly forbidden by the constitution.

6. The power to adjust and pay such claim is in the legislature alone, and is only saved to it by the specific and exceptional authority conferred upon it by the concluding portion of section 3, art. 12: "The legislature may make appropriations for expenditures incurred in suppressing insurrection or repelling invasion.

(Syllabus by the court.    Opinion filed July 18, 1894.)

Action original in this court to recover compensation from the State of South Dakota for subsistence furnished men and horses in the service of the state during the Sioux Indian insurrection of 1890 and 1891. A demurrer to the complaint was interposed by the state. Demurrer sustained.

The facts are stated in the opinion.

*Charles W. Brown* and *A. W. Bangs,* (*Horner & Stewart, of counsel*), for plaintiff.

*Coe I. Crawford, Attorney General,* for defendant.

KELLAM, J. This is an original action in this court, under chapter 1, Laws of 1890. The complaint alleges that between the 1st day of December, 1890, and the 16th day of January, 1891, the Sioux Indians, at and about Pine Ridge agency, in the State of South Dakota, were in a state of insurrection and rebellion against the government of the United States and of the State of South Dakota, and, with force and arms, were invading other portions of the state, to-wit, that part thereof known as the "Black Hill Country," and were murdering, killing, and plundering the citizens and settlers therein, wherefore it became the duty of the governor of the state to call out the militia and troops of said state to suppress said insurrection and repel said invasion; that, for said purpose, the then governor of the state, as commander in chief of the military forces of the state, did, between the 30th day of November, and the 23rd of December, 1890, cause and direct "to be enlisted, enrolled and mustered into the military service of said state a large number of soldiers, cavalry, rangers, and scouts, and duly appointed, constituted, and commissioned one Merritt H. Day the commanding officer thereof, and ordered and requested said Merritt H. Day, at the cost and expense of said state, to obtain and cause to be furnished to said soldiers, cavalry, rangers, and scouts, proper and sufficient board, food, and lodging, and proper and sufficient hay, oats, corn, and provender, stabling and corrals

for such horses as said soldiers, cavalry, rangers, and scouts might use or need in said military service;" that the plaintiff, who was then, and is now, a resident of Pennington county, upon the request, order, and requisition of said Day, as such commanding officer, between the 1st day of December, 1890, and the 16th day of January, 1891, furnished to said men, so in the military service of the state, food and lodging, and to their horses provender, stabling, and corrals, a detailed account of each being attached to the complaint, the reasonable and agreed value of which was $2,870.40; that prior to the commencement of this action, the plaintiff presented the said claims to the auditor of the state for allowance and payment, which were refused; and that the same has never been paid, nor any part thereof. To this complaint the state, through its attorney general, demurrs, on the ground that the facts stated do not constitute a cause of action against the state. The position of the attorney general is like this: Section 4, art. 4, of the state constitution makes the governor "commander-in-chief of the military and naval forces of the state," with power to "call out the same to execute the laws, suppress insurrection and repel invasion." Section 1. art. 15, of the constitution defines "the military and naval forces of the state" as "the militia of the state," and consists "of all able bodied male persons residing in the state, between the ages of eighteen and forty-five," etc. By section 2 of said article the legislature is required to "provide by law for the enrollment, uniforming, equipment and discipline of the militia, and the establishment of volunteer and such other organizations, or both, as may be deemed necessary for the protection of the state, the preservation of order and the efficiency and good of the service." In pursuance and discharge of the duty thus imposed upon the legislature by the constitution, is duly provided by law a complete and detailed plan for the enrollment, organization, and equipment and subsistence of the militia of the state. Comp. Laws, § 1918 et seq. Section 1919 of such Military Code authorizes the commander-

in-chief, "in case of war, invasion, or to prevent invasion, riot or insurrection, * * * to order out from time to time for actual service as many of the militia thus enrolled as necessity may require, and to provide for their organization in the manner hereinafter prescribed for the organization of volunteer militia; provided, that in all such cases the organized volunteer militia shall first be ordered into service." After declaring the manner in which the militia shall be organized, the said Military Code provides for a supply department and its officers and organization. Section 1939 makes it the duty of the "chief of supply," to "keep a just and true account of all expenses necessarily incurred for the military service of the territory, and said account shall be paid on the order and approval of the commander-in chief. He shall purchase and distribute to the National Guard all military stores and supplies authorized by law, shall pay all incidental expenses of the service, including transportation, freight, express, postage and telegrams on public business; shall pay the officers and members of the national guard; shall furnish clothing, rations, tools, camp and garrison equipage, make contracts for and pay the rent for offices, armories, store houses, camp grounds, and such other duties authorized by law as he may be directed to perform by the orders of the commander-in-chief." Section 1690 provides that in case of any breach of the peace, tumult, riot, or resistence to process of the state, or such imminent danger thereof as will not admit of delay, the sheriff of any county, or the mayor of any city, may call upon the commandment of the National Guard stationed nearest thereto for aid. Section 1973 provides that members of the National Guard that are required to be mounted shall furnish their own horses and equipments, and provides what and how they shall be paid for the same. By subsequent legislation, in 1890 and 1893, slight changes were made in this Military Code, but they do not affect its general purpose or plan. The attorney generally contends that the constitutional authority of the governor, as com-

mander-in-chief, to call out the military forces of the state for the purpose indicated, must be read and construed in connection with the other constitutional provisions defining what shall constitute such military forces, and the constitutional authority of the legislature to provide for their enrollment, equipment, etc.; and that, the legislature, in pursuance of such authority, having so provided, and directed the manner in which they should be subsisted when called out, and the manner in which and by whom the expenses thereof should be approved and paid, no contract or liability binding upon the state could be created or legally incurred except as so provided. He therefore insists, as a conclusion, that the complaint is fatally defective, in that it does not show that the soldiers, cavalry, rangers, and scouts which it is alleged the governor called out were or constituted any part of the militia or military forces of the state, the expense of whose subsistence could in any event be charged against the state; that the duty of providing for the enrollment and organization of the militia being by the constitution expressly committed to the legislature, the governor had no authority to order such enrollment, but that such act on his part was nugatory, and that the soldiers, cavalry, rangers, and scouts so enrolled were no more a part of the military forces of the state than they were previous to such enrollment, and did not thereby become subject to be ordered out; that the going out of such a body of men under such circumstances was voluntary on their part, and could create no legal liability on the part of the state for their subsistence; and, further, that, the statute having expressly provided how such subsistence should be provided and paid for, neither the governor nor his appointee, Day, could make a contract for the same upon which the state would be liable.

While we should be reluctant to concede all that the attorney general claims, we are of the opinion that the facts stated in the complaint do not, on their face, show a cause of action against the state. The governor of the state is the ex-

ecutive head of the state. As such, he is charged with the ex-
ecution of the laws, and with the protection of the state against
invasion and insurrection. As a means for the accomplish-
ment of these ends, he is made the commander-in-chief of the
military forces of the state, with authority to order them out
when necessary. To put and keep them in condition to be so
used with effect, the legislature is charged with the duty of pro-
viding for their enrollment and organization. This duty as
plainly rests upon the legislature as the duty to call them out
in a proper case rests with the governor, but it remains patent
that the paramount thought through all is to put such a body
of men at the command of the executive as will enable him to
execute the laws, repel invasion and suppress insurrection. To
uphold the authority, and to protect the people of the state in
their lives and property, is the end in view. The enrollment
and equipment of the militia is one of the means for the ac-
complishment of such end. The means are constitutionally
prescribed, but they are still means only to which the ultimate
end is paramount. It would be a dangerous conclusion that,
no matter what the emergency, the governor could call out
only such of the state militia as had been previously properly
enrolled under the authority of the legislature, or, having
called them out, they could under no circumstances be legally
subsisted, except through the prescribed routine of the supply
or quartermaster's department. We think a reasonable and
practical construction of these several provisions, considered
with reference to each other and their evident purpose, re-
quires us to hold that, under them, while the rights and the
duty of the governor, as commander in chief, to call out the
militia for the defense of the state for the purposes and in the
cases named in said section 4, art. 4, does not absolutely de-
pend upon the legislature having first discharged its duty in
providing for their enrollment and organization, still the theory
and presumption are that the legislature will have done so,
and that the governor will call out the militia so enrolled and

organized. Therefore, until it appears as a fact that the militia has not been so organized and enrolled as contemplated by the constitution, there would appear to be no justification for the governor's order for their enrollment and organization. His authority to direct their enrollment and organization could only be an implied power springing from his express power to use them, and the necessity for their being enrolled and organized in order to be used. In the absence of facts showing a necessity therefor; the governor's order for their enrollment would be unauthorized, and would not constitute the persons so enrolled the "enrolled militia," which the constitution contemplated he should call out. For aught that appears in the complaint, the qualified militia of that portion of the state from which it is alleged that soldiers, cavalry, rangers, and scouts were, by the order of the governor, enrolled and mustered, were already, and pursuant to the rules prescribed by the legislature, duly enrolled and organized, and ready and available for the service which the constitution authorized the governor to require of them. In such case the governor would have no authority to order a new enrollment, or, as commander in chief of the militia, to order out persons not so enrolled.

Again, the constitution places under the governor's command, and authorizes him to order out, the "military forces" of the state, and defines of what persons such forces shall consist. There is nothing in the complaint to indicate that the soldiers, cavalry, rangers, and scouts which it is alleged he caused to be enrolled, mustered, and called out were such persons as could or did constitute a part of the militia of the state, and for whose subsistence the state could in any event be held liable. These defects in the complaint might perhaps be cured by amendments, but there is another view of the question presented by this case, which seems to us more serious.

We think that under these constitutional provisions, and the laws of the state supplemental thereto, providing for the subsistence of the military forces of the state, the governor

neither directly nor indirectly, by the officer in charge of such forces, would have authority to make contracts binding upon the state for the expense of their maintenance. There is certainly nothing either in the constitution or the statute conferring such authority. On the other hand, section 9, art. 11, of the constitution expressly declares that "no indebtedness shall be incurred * * * by the state * * * except in pursuance of an appropriation for the specific purpose first made;" and, further, the legislature has plainly provided, that such subsistence should be furnished, and the expense thereof adjusted, by the supply or quartermaster general's department. That the military forces so called into service must be fed, even though the quartermaster fails to furnish supplies, goes without saying; but it does not necessarily follow that the governor has authority to make or authorize the making of contracts for supplies which are binding upon the state. As military commander, he doubtless would have power, and might properly exercise it, in case of pressing emergency, to supply the troops from any available source with necessary subsistence, as he would have the right in such exigency to supply them with arms and ammunition from the stores of private individuals; and the legislature would have express constitutional authority to make appropriations for the payment of the same (section 3, art. 11, Const.) not in discharge of a legally-created indebtedness, for, under the constitution, no such indebtedness could be incurred, but on the broad ground that honesty and good conscience would require the state to make adequate compensation for private property which it had used. The authority of the legislature to pay such claim does not rest upon contractual rights, for the creation of such rights is specifically prohibited, not only by the constitutional provision already cited, but by section 3, art. 12: "The legislature shall never * * * authorize the payment of any claims or part thereof created against the state under any agreement or contract made without express authority of law, and all such unauthorized agree-

ments or contracts shall be null and void." To allow the legislature to recognize and appropriate public money on such a claim, it was necessary to affirmatively and expressly provide as it did by the concluding portion of said section 3, art. 12, notwithstanding no legal indebtedness had been created against the state, "the legislature may make appropriations for expenditures incurred in suppressing insurrection or repelling invasion." It would be difficult to justify a holding that a party had a legal claim, enforceable in an action at law, upon a contract which the fundamental law of the state declared void, and which the legislature itself could recognize and pay only by virtue of an exceptional and specific authority. The makers of the constitution, having determined to protect the state against liability on "agreements or contracts made without express authority of law," by whomsoever attempted, used general and strongly prohibitive terms; but, foreseeing that emergent cases of which this may be one, might arise, in which there was no legal claim because no authorized contract, but still meritorious, excepted from the sweep of such prohibition "expenditures incurred in suppressing insurrection or repelling invasion," but only to the extent of submitting the same to the legislature, and allowing it, upon its judgment, to adjust and make appropriation therefor.

For the reason stated, we are of the opinion that the complaint does not show a cause of action against the state. Whether the claim is based upon an attempted express contract of Day, for the state, to pay an agreed price for the subsistence furnished, which, as we have tried to show, he had no authority to make, or upon the theory that such subsistence was furnished upon the coercion and force of a military order, it is a claim adjustable only by the legislature, under the power conferred by said section 3, art. 12. Upon the facts disclosed, we are of the opinion that the claim is not one enforceable in the courts, and the demurrer to the complaint is sustained. To save any possible rights of the plaintiff, however, and to af-

ford him opportunity to take such steps as he may be advised, he may have 40 days in which to amend his complaint, if he shall be advised that it is so amendable, as to state a cause of action.   All the judges concur.